UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| PAM LAMKIN, an individual,<br><br>        Plaintiff,<br><br>   v.<br><br>PORTFOLIO RECOVERY ASSOCIATES, LLC,<br><br>        Defendant. | No. 2:18-cv-03071 WBS KJN<br><br>MEMORANDUM AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT |

----oo0oo----

Plaintiff Pam Lamkin filed this lawsuit against defendant Portfolio Recovery Associates, LLC ("PRA") alleging that defendant auto-dialed calls to plaintiff's cellphone without her express consent, in violation of the Telephone Consumer Protection Act ("TCPA"). 47 U.S.C. § 227. Before the court are the parties' cross-motions for summary judgment, and defendant's motion to strike the testimony of plaintiff's expert witness.

I.    Factual and Procedural Background

Defendant PRA purchases consumer debt and then attempts to collect the debt from the debtor. (Pl's Mem. in Supp. Summ. J. at 2 (Docket No. 15).) Prior to August 1991, plaintiff applied for and received a credit card from Wells Fargo Bank. (Def.'s Resp. to Pl.'s Statement of Undisputed Facts ("SUF") at 4-5, ¶ 17 (Docket No. 19).) Later that year, after plaintiff failed to make all the payments on the account, Wells Fargo charged off the account. (Id. at 5, ¶ 18.) In December of 2007, PRA purchased Lamkin's credit card debt. (Id. at 5, ¶ 19).

After the purchase, PRA began a process known as "skip tracing," where a debt buyer contacts third-party credit reporting agencies to solicit contact information those agencies may have on the debtors. (Def.'s Resp. to Pl.'s SUF at 8, ¶ 31.) PRA ultimately obtained plaintiff's cell phone number from a Credit Bureau report in March 2008. (Id.) PRA did not receive Lamkin's cell phone number from any other source. (Id. at 4, ¶ 15.) PRA then made 199 calls to plaintiff's cell number between February 19, 2008 and August 16, 2010 to collect the debt.[1] (Stip. at 2, ¶ 3 (Docket No. 12).) PRA never determined if plaintiff had expressly consented to be contacted. (Id. at 4, ¶ 9). On August 16, 2010, plaintiff requested that PRA cease all contact with plaintiff. (Def.'s SUF at 6, ¶ 30, 31 (Docket No. 17-2).) PRA did not contact plaintiff thereafter. (Id. at 6, ¶ 32.)

In making the calls, PRA used the Avaya Proactive

---

[1] The parties agree that all the calls at issue were made during the applicable statute of limitations. (Def.'s Resp. to Pl.'s SUF at 6-7, ¶ 25 (Docket No. 19).)

2

Contact Technology ("Avaya"). When the calls were made, Avaya had the ability to store telephone numbers and did in fact store telephone numbers. (Def.'s Resp. to Pl.'s SUF at 3, ¶ 9.) Avaya could also dial these stored telephone numbers without human intervention. (Id. at 3, ¶ 10.) Indeed, the calls were made in the predictive dialing mode (id. at 2, ¶ 5), under which the dialing system calls the stored numbers "automatically and directly."[2] (Pl.'s Mem. in Supp. of Mot. Summ. J. at 11-12 (Docket No. 15).)

Plaintiffs rely on the testimony of Randall Snyder to further describe the functionality of Avaya. According to Snyder, Avaya has the "capacity to store or produce telephone numbers to be called, using a random or sequential number generator and to dial telephone numbers without human intervention." (Decl. Randall Snyder, at ¶ 33, 44, Ex. A (Docket No. 18-1). Avaya, Snyder continues, can also call numbers "using a random or sequential number generator" (id. at ¶ 35), can make "automatic calls from stored lists of telephone [numbers] and has the capacity to dial stored numbers automatically" (id.).

In 2018, plaintiff filed this lawsuit against PRA,[3]

---

[2] Predictive dialing allows the call center to "predict" the availability of call center agents that can respond to the calls that have been dialed by the predictive dialing system and answered by the called party. (Pl.'s Mem. in Supp. of Mot. Summ. J. at 11 (Docket No. 15); see also Stip. at 3, ¶ 10 (Docket No. 12).)

[3] Plaintiff was a member of the class in the class action lawsuit in In re Portfolio Recovery Associates, LLC. Telephone Consumer Protection Act Litigation, No. 11-MD-2295-JAH-BGS, filed in the United States District Court for the Southern District of California. Plaintiff opted out of the settlement in the class action and can therefore sue individually. (Def.'s Resp. to

3

alleging that, because Avaya qualifies as an automatic telephone dialing system under the Telephone Consumer Protection Act ("TCPA") (Compl. at 4, ¶ 17 (Docket No. 1)), and because PRA failed to obtain plaintiff's express consent prior to calling her cell phone (id. at 6, ¶ 31), each call constituted a violation of the TCPA. Plaintiff requests treble damages for PRA's alleged "willful or knowing" violation of the statute. (Id. at 7, ¶ 35(a).) Both parties now seek summary judgment under Federal Rule of Civil Procedure 56 on plaintiff's sole claim under the TCPA. Defendant also seeks to strike Snyder's testimony.

II. Discussion

Summary judgment is appropriate when the movant shows that no genuine dispute as to any material fact remains and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56.

A. The Telephone Consumer Protection Act (TCPA)

Congress enacted the TCPA to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls." S. Rep. No. 102-178. Under the Act, it is "unlawful for any person . . . (A) to make a call (other than a call made . . . with the prior express consent of the called party) using any automatic telephone dialing system . . . (iii) to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1). Thus, "the three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's

---

Pl.'s SUF at 8-9, ¶ 32.)

4

prior express consent." Meyer v. Portfolio Recovery Assocs., LLC, 707 F.3d 1036, 1043 (9th Cir. 2012).

Defendant does not dispute that PRA called plaintiff's cellular telephone. (Def.'s Resp. to Pl.'s SUF at 2, ¶ 3 (Docket No. 19).) Defendant also does not offer any evidence that PRA had plaintiff's prior express consent to call her 199 times. On the contrary, defendant admits that it obtained Ms. Lamkin's number only through a third-party credit report.

Therefore, with respect to liability, the issue in this case is only whether PRA's Avaya constitutes an automatic telephone dialing system ("ATDS"). Defendant argues that, to constitute an ATDS, a system must "generate random or sequential numbers." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 3 (Docket No. 17-1).) Plaintiff, on the other hand, argues that an ATDS is not limited to systems that generate and dial such numbers, but also includes devices with the capacity to dial stored numbers automatically. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 6 (Docket No. 15). Each party relies on Ninth Circuit decisions. This court now applies the appropriate definition of ATDS under the Act.

B. The Definition of ATDS

1. FCC Orders

Since the enactment of the TCPA in 1991, the definition of ATDS has remained the same: "equipment which has the capacity —-(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1); Marks v. Crunch, 904 F.3d 1041, 1044-45 (9th Cir. 2018).

By the early 2000s, new telemarketing technologies had emerged. The Federal Communications Commission ("FCC") became particularly concerned about the proliferation of predictive dialers, which do not "dial[] a random or sequential block of numbers," but rather "automatically dial[] a list of numbers that had been preprogrammed and stored in the dialer." Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd. 14,014, 14,017, 14,022 (2003) ("2003 Order"). As a result, the FCC issued a series of rulings between 2003 and 2015 to determine whether the predictive dialer was an ATDS under the statute. Marks, 904 F.3d at 1045. In its 2003 Order, the FCC determined that, to be an ATDS, a predictive dialer need not currently be used to generate random or sequential numbers -- it need only have the capacity to do so. In 2012, the FCC reasoned that the statutory definition of ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd. 15,391, 15,392 n.5 (2012). In 2015, however, the FCC seemed to adopt the opposite view that a device "would not meet the definition of an ATDS unless it had the capacity to dial random or sequential numbers." Marks, 904 F.3d at 1046 (citing Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7691, 7971-72 (2015) ("2015 Declaratory Ruling")).

  2. D.C. Circuit's Decision in *ACA International v. FCC*

In response to the uncertainty following the FCC's 2015 Declaratory Ruling, "a large number of regulated entities challenged the FCC's definition of an ATDS." Marks, 904 F.3d at 1046. The petitions were consolidated in the D.C. Circuit. See Consolidated Order, ACA Int'l v. FCC, 885 F.3d 687 (D.C. Cir. 2018). The D.C. Circuit court concluded that, while "[i]t might be permissible for the Commission to adopt either interpretation" of the statute -- one that requires that the device generate random or sequential numbers or one that requires only that the device dial automatically from a stored list -- "the Commission cannot, consistent with reasoned decision-making, espouse both competing interpretations in the same order." Id. at 703. The court thus "set aside the Commission's treatment of those matters." Id.

3. Ninth Circuit's Decision in *Marks v. Crunch San Diego*

After the D.C. Circuit issued its opinion in ACA International, the Ninth Circuit addressed the definition of ATDS in Marks v. Crunch San Diego, LLC., 904 F.3d 1041 (9th Cir. 2018). The Marks court first concluded that, after the D.C. Circuit's decision, "the FCC's prior orders on [the definition of ATDS] are no longer binding" and that "only the statutory definition of ATDS as set forth by Congress in 1991 remains." Id. at 1049. The court thus "beg[a]n anew to consider the definition of ATDS under the TCPA." Id. 1049-50. Finding the plain language of the statute ambiguous, and thereafter "reading the definition 'in [its] context and with a view in [its] place in the overall statutory scheme,'" id. at 1052 (citing FDA v.

7

Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)), the court concluded that "the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically." Id.

Because under Marks a device that has the capacity to "store numbers to be called . . . and to dial such numbers" is an ATDS, id., and because PRA "does not dispute that its Avaya technology calls telephone numbers from a stored list" (Def.'s Opp. to Pl.'s Mot. Summ. J. at 3 (Docket No. 20), Avaya is an ATDS.

4. Ninth Circuit's Decision in *Satterfield*

Defendant asks the court to rely instead on the Ninth Circuit's decision in Satterfield v. Simon & Schuster, Inc., 569 F.3d 946 (9th Cir. 2009). According to defendant, under Satterfield, a device must have the capacity to generate random or sequential numbers to constitute an ATDS. Because Marks conflicts with defendant's reading of Satterfield, and because one panel cannot overturn the decision of a previous panel, defendant argues that Satterfield is the law. See Von Colln v. Cty. of Ventura, 189 F.R.D. 583, 589 n.2 (C.D. Cal. 1991) (discussing that where two panel decisions conflict, "the 'earliest case' rule is the correct one because (1) a decision of a prior panel cannot be overturned by a later panel, and (2) because of the importance of the prior precedent rule").

Satterfield, however, does not conflict with Marks. The Satterfield court discussed only the meaning of the term

"capacity." The scope of that capacity under the TCPA was not at issue.[4] 569 F.3d at 951 ("We find that the district focused its analysis on the wrong issue . . . A system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it. Since the district court did not focus its decision on this issue, we must then review the record."); see also Marks, 904 F.3d at 1051 n.6 ("Our statement in Satterfield that 'the statutory text is clear and unambiguous' referred to only one aspect of the text: whether a device had the capacity 'to store or produce telephone numbers . . . .'") (emphasis in original).

The court in Satterfield indeed had no reason to address whether a predictive dialer must generate random or sequential numbers to be an ATDS because in the 2003 Order, "the FCC . . . defined 'automatic telephone dialing system' to include predictive dialers." Meyer, 707 F.3d at 1043. The Ninth Circuit heard Satterfield in 2009. Only after the D.C. Circuit vacated the FCC's 2003 interpretation of what consists an ATDS in 2018 could courts opine on the issue.[5] See Marks, 904 F.3d at 1049

---

[4] Notably, the Ninth Circuit unanimously denied the Marks appellee's petition for rehearing en banc. Marks v. Crunch San Diego, LLC, 14-56834 (9th Cir. Oct. 30, 2018). In that petition, appellee's first argument was that Marks conflicts with Satterfield. (Petition for Rehearing En Banc, at 7 (Docket No. 113-1).)

[5] Defendants argue that to apply Marks here would apply the law retroactively. This argument has no traction. The definition of ATDS included predictive dialers from 2003 until the D.C. Circuit vacated the FCC's 2003 Order in 2018. PRA obtained Lamkin's number and began calling her in 2008. Because Marks is consistent with the FCC's 2003 Order, to apply Marks in this instance would merely apply the law as it was at the time of the offense.

9

n.4 ("An appellate court lacks authority to consider a challenge to an FCC order that is brought after sixty days from the date when the FCC releases the final order to the public."); see also U.S. W. Commc'ns, Inc. v. Jennings, 304 F.3d 950, 958 n.2 (9th Cir. 2002) (stating that "properly promulgated FCC regulations currently in effect must be presumed valid" when not challenged under the Hobbs Act).

The Ninth Circuit's subsequent decision in Duguid v. Facebook, 926 F.3d 1146 (9th Cir. 2019), confirms that Marks is the law. In Duguid, the Ninth Circuit again addressed the definition of an ATDS. According to the court, the Marks court "construed ACA International to wipe the definitional slate clean." Id. at 1149-50. Marks then "rearticulated the definition of an ATDS." Id. at 1150. In Duguid, the Marks definition of ATDS "governed [the] appeal" and now also binds this court. Id.

Accordingly, because the parties do not dispute that PRA's Avaya can "store numbers to be called" and "dial such numbers automatically," Avaya is an ATDS.[6] Marks, 904 F.3d at 1052.

C. Damages

Under the TCPA, "if the court finds that the defendant willfully or knowingly violated [Section 227(b)], the court may,

---

[6] Defendant's motion to strike Snyder's testimony is moot because it raises objections that are inconsequential given the court's finding on the definition of an ATDS. Defendant concedes that Avaya calls stored numbers automatically, (Def.'s Resp. to Pl.'s SUF at 3, ¶¶ 9, 10), and, under Marks, plaintiffs need not prove that Avaya generates random or sequential numbers.

10

in its discretion" award treble damages.  47 U.S.C. § 227(b)(3).
The Act, the FCC, and the Ninth Circuit are all silent on the
definition of the phrase "willful or knowingly."  District court
decisions are therefore instructive here.

A defendant willfully or knowingly violates the TCPA when the defendant intends or knows "that it was performing each of the elements of a TCPA claim (i.e., [1] that it was making a call, [2] to a person who did not provide prior express consent, [3] using an automated system)." Haysbert v. Navient Solutions, Inc., 15-4144 PSG (Ex), 2016 WL 890297, at *10 (C.D. Cal. March 8, 2016) (citing Lary v. Trinity Physician Fin. & Ins. Servs., 780 F.3d 1101, 1107 (11th Cir. 2015); Olney v. Progressive Cas. Ins. Co., 993 F. Supp. 2d 1220, 1227 (S.D. Cal. 2014); Harris v. World Fin. Network Nat. Bank, 867 F. Supp. 2d 888, 895 (E.D. Mich. 2012)).  Plaintiff need not show that defendant knew his conduct would violate the TCPA.  Id.  Accordingly, the threshold to assess treble damages is "low."  Roylance v. ALG Real Estate Services, Inc., 5:14-cv-02445-PSG, 2015 WL 1522244, at *11 (N.D. Cal. March 16, 2015) (citing Charvet v. Ryan, 116 Ohio St.3d 394, 400 (2007)).

### 1. Making a Call

It strains credulity to think that defendant did not intend to call plaintiff.  Plaintiff owed defendant money and thus the 199 calls were no accident.  (See Def.'s Statement of Undisputed Facts at 4, ¶ 15) ("[R]epresentatives . . . contact debtors about paying their debts.").)

### 2. Lacking Prior Express Consent

The undisputed facts establish that defendants knew that

plaintiff had not given her prior express consent to be called. The parties agree that (1) plaintiff did not give PRA her cellphone number; (2) PRA instead obtained plaintiff's number from a third party; (3) PRA called plaintiff 199 times; (4) PRA never investigated whether plaintiff had consented to be called; (5) PRA stopped calling plaintiff at plaintiff's request.

Defendant suggests that the only way to satisfy the willful or knowing standard is to show that defendant called plaintiff after plaintiff asked defendant to cease contact. See, e.g., Roylance, 2015 WL 1522244, at *11; Arbelaez v. Capital Advance Sols., LLC, No. 15-23137-CIV, 2016 WL 2625020, at *2 (S.D. Fla. Jan. 20, 2016); Harris, 867 F. Supp. 2d at 896. This view is incorrect.

Here, no reasonable trier of fact could find that PRA thought it had plaintiff's express consent. PRA never sought an opportunity to obtain consent. PRA acquired plaintiff's number from a third party and subsequently failed to inquire into whether plaintiff consented to be called. PRA therefore "should have known that they were calling a person who did not provide prior express consent." N.L. by Lemos v. Credit One Bank, N.A., No. 2:17-CV-01512-JAM-DB, 2019 WL 1428122, at *2 (E.D. Cal. Mar. 29, 2019).

### 3. Using an Automated System

The undisputed facts also establish that PRA intended to use an automated system to place its calls. Defendant used the Avaya system to "prevent[] PRA from losing man hours dialing debtor phone numbers" by "calling those numbers via electronic means." (Pl.'s Statement of Undisputed Facts, Ex. 11 at 3 (Docket No. 16-

3).) In other words, PRA used Avaya specifically because it intended to automate the process of calling debtors.

### 4. Compliance with Satterfield

Defendant insists that its actions were not willful or knowing because it was complying with Satterfield. This court, again, rejects defendant's flawed interpretation of the law. As discussed above, the law on the definition of ATDS from 2003 to 2018 was the FCC's 2003 Order -- not Satterfield. The 2003 Order defined predictive dialers to be an ATDS and PRA knew that Avaya was a predictive dialer. (Def.'s Resp. to Pl.'s SUF at 8, ¶ 29.) Defendant cannot rely on its misconstruction of the law to avoid liability under the statute.

Because the violations are willful and knowing, the court has the discretion to increase damages up to $1,500 per call. The court exercises its discretion and awards treble damages of $298,500 (199×$500×3).

IT IS THEREFORE ORDERED that plaintiff's Motion for Summary Judgment (Docket No. 14) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that defendant's Motion for Summary Judgment (Docket No. 17) be, and the same hereby is, DENIED.

Dated: September 25, 2019

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

13